# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN,

   Plaintiff,

v.

THOMAS FITTON, *et al*.

   Defendants.

Case No. 1:19-cv-02793-TSC

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT
## OF MOTION TO DECLARE PLAINTIFF A VEXATIOUS LITIGANT

   Defendants Thomas J. Fitton ("Fitton"), James F. Peterson ("Peterson"), Paul J. Orfanedes

("Orfanedes") and Christopher J. Farrell ("Farrell"), by counsel and pursuant to LCvR 7, hereby

file this Reply Memorandum in support of their Motion to Declare Plaintiff a Vexatious Litigant.

## I. INTRODUCTION

   Like each complaint filed by Plaintiff Larry Klayman ("Klayman"), his Opposition[1]

consists solely of unsupported assertions. For example, Klayman did not voluntarily resign from

Judicial Watch, Inc. ("JW") to run for the U.S. Senate. He was forced out and provided with an

opportunity to save his reputation. Instead, he engaged in 14 years of frivolous litigation designed

to harass the Defendants. Not a single claim alleged against Fitton, Orfanedes or Farrell has been

successful.[2] Yet Klayman continues to name them as defendants without any supporting facts.

Even here, Klayman resurrects tired and disproven allegations like a fraudulent building fund or

---

[1] It is not clear whether Klayman's Opposition is actually at issue. Filed on January 29, 2020, the Opposition was Entered in Error due to a Notice of Error issued by the Clerk of this Court with instructions to refile the paper with corrections. Klayman did not comply with the Clerk's Notice of Error. Pursuant to LCvR 5.4(g)(2), the Opposition is not deemed to be filed.  However, out of an abundance of caution, the Defendants file this Reply Memorandum.

[2] This action is the first case naming Peterson as a defendant.

that Fitton stated his dismissal was due to a sexual harassment complaint.[3] As established by the

detailed argument and evidence in the Motion, Klayman is a vexatious litigant.

## II.   KLAYMAN'S "VOLUNTARY" RESIGNATION WAS TO AVOID AN INVESTIGATION

Ignoring all evidence to the contrary, Klayman persists in stating that he left JW to run for

the U.S. Senate. Opposition at pp. 2, 3 and 13. Klayman's charade of litigation is based primarily

on this false assertion. The actual circumstances of his separation from JW are:

- In a May 2003 meeting with Fitton and Orfanedes, Klayman disclosed a copy of the complaint for divorce filed by his wife, Stephanie DeLucca, alleging he physically assaulted her and was pursuing a romantic relationship with a JW employee. Exhibit A at 1830 and 1837; Exhibit B at 2508; Exhibit C at p. 2; Exhibit D at 3180-85, 3189.

- During the May 2003 meeting, Klayman admitted that he was in love with the employee and that the allegations regarding physical assault of his spouse were accurate. *Id*.

- On the following day, during a lunch with Fitton and Orfanedes, Klayman was informed that he would have to resign or face an investigation into his potential misuse of JW assets, his pursuit of a relationship with a JW staff member and the spousal abuse allegations. Exhibit A at 1830; Exhibit B at 2516-17.

- Klayman blamed his former spouse for ruining his employment with JW by including the allegations of his wrongful conduct in her complaint. Exhibit D at 3189-90.

---

[3]      This assertion borders on the humorous as the only evidence he can produce shows that Fitton affirmed his dismissal was not due to a sexual harassment complaint.

A jury of his peers heard all the evidence and rejected his version of the events in *Klayman v. Judicial Watch, Inc., et al.*, Case No. 1:06-cv-670-CKK (D.D.C.) and awarded damages to JW for the false advertising. Exhibit E.

JW never disclosed the explanation for his separation until Klayman filed the 2006 lawsuit. He forced JW to explain the circumstances of separation to counter Klayman's false advertising campaign designed to return him to the organization.

## III.   KLAYMAN DOES NOT EXPLAIN ANY BASIS FOR THE MULTIPLE LAWSUITS OR THE MERITLESS CLAIMS

Defendants' Motion is supported by 19 meritless lawsuits and 37 exhibits that show Klayman's vexatious nature and tactics. In response, Klayman asserts that Defendants are to blame because the actions "say[] nothing about Plaintiff Klayman, other than that he exercises his constitutional right to seek redress from the courts for the wrongs committed against him." This assertion is wrong. Klayman has NEVER put forth any facts to prove any wrong committed against him by any of these Defendants. To oppose this Motion, he does not provide any evidence to show that even a single claim had merit. Klayman's allegations regarding these Defendants are all manufactured and false. As shown in the Motion, several courts commented on the abusive litigation tactics employed by Klayman. *See e.g.*, factual summaries for Case 2, Case 5 and Case 14 in the Defendants' Motion.

Klayman's reliance on the current case is similarly without merit. As explained in the Motion to Dismiss for failure to state a claim, the Complaint alleges no fact to show that Defendants uttered any defamatory statement regarding Klayman. [Docket No. 4] In a tacit admission, Klayman retreated to a request that he be permitted to find support for a claim through discovery.

III.   **KLAYMAN'S EXPERIENCE AND LICENSE TO PRACTICE LAW IN THIS JURISDICTION MAKE HIM A UNIQUE *PRO SE* LITIGANT**

Klayman's Opposition relies on case law applying the vexatious litigant standard to non-lawyer *pro se* plaintiffs. This case law is inapposite because it relates to *pro se* plaintiffs with no legal education. Klayman is not the normal *pro se* plaintiff. He is a trial attorney with over 43 years of experience. Opposition at fn1. Klayman's self-described experience includes a stint as a "federal prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was on the trial team that broke up the AT&T monopoly."  Complaint ¶ 4. He has been counsel in at least 350 cases before this Court. Klayman's litigation efforts are supported by a staff of attorneys and paralegals charging $695.00/hour. Opposition at p. 12. Klayman is not entitled to cloak himself with the mantle of an ordinary *pro se* litigant.

In *Duru v. Mitchell*, 289 F. Supp. 3d 112 (D.D.C. 2018), a true *pro se* plaintiff sued various defendants in one case in this court, and apparently one case in Texas. The moving parties sought a declaration of vexatious litigant but "failed to allege particularized facts" regarding the litigation against them and "failed to apply the framework for a vexatious litigant injunction." *Id*. at 117. That is not the case before this Court. Defendants provided detailed facts showing 19 meritless cases that provide extensive evidence from which the Court can make factual findings supporting the standard for a vexatious litigant. Given the number and content of these cases, Klayman cannot seek safe harbor in *Rogers v. Johnson-Norman*, 514 F. Supp. 2d 50, 53 (D.D.C. 2007), where no pattern of harassment was found from a single case. *See also Speleos v. McCarthy*, 201 B.R. 325, 330 (D.D.C. 1996) (moving party relied on a single decision in which the alleged vexatious litigant was a defendant).

The evidence and argument presented permit this Court to examine the number and content of filings. The factual summaries and related orders show how Plaintiff's actions are harassing.

4

His litigations have clogged the docket of this Court and others. His cases are not mere FOIA requests as *In re Powell*, 851 F.2d 427, 433 (D.C. Cir. 1988). His cases contain insults and allegations, unsupported by facts, that accuse the Defendants of fraud and other criminal conduct, knowing that he cannot be sued for such false allegations due to the litigation privilege. *See Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1287 (D.C. Cir. 2014) (attorney is absolutely privileged to publish defamatory matter in communications preliminary to, during the course or as a part of a judicial proceeding if related to the proceeding).

## IV.     KLAYMAN'S REQUEST FOR SANCTIONS MUST BE REJECTED

Demonstrating his hypocrisy, Klayman seeks sanctions for the filing of one motion supported by 19 lawsuits and 37 exhibits. Because Klayman did not, and cannot, demonstrate that the Motion is contrary to law or filed in bad faith, there are no grounds for an award of sanctions in his favor. The Motion is supported by overwhelming merit and should be granted.

WHEREFORE, Defendants respectfully requests that this Court GRANT the Motion and enter an injunction prohibiting Klayman from filing any further claims against these Defendants without first obtaining leave from the Chief Judge of this Court, and that Klayman be required to post security for all pending and future actions against the Defendants.

Dated: February 5, 2020                           Respectfully submitted,

/s/

_____
Richard W. Driscoll (436471)
DRISCOLL & SELTZER, PLLC
300 N. Washington St., Suite 610
Alexandria, Virginia 22314
703.822.5001 Telephone
703.997.4892 Facsimile
Email: rdriscoll@driscollseltzer.com

*Counsel for Defendants Judicial Watch, Inc. and Thomas J. Fitton*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 5th day of February 2020, a copy of the foregoing Reply Memorandum was served by the Court's ECF system upon all counsel of record listed on the Notice of Electronic Filing.

/s/

_____

Richard W. Driscoll

# EXHIBIT A

1      here, please.  Mr. Orfanedes, I'm not going to swear you in

2      again.  I'll just remind you you're still under oath.

3                   THE WITNESS:  Very good.

4                         DIRECT EXAMINATION

5      BY MR. DRISCOLL:

6          Q     Good afternoon, Mr. Orfanedes.

7          A     Good afternoon.

8          Q     Would you state your name again for the record?

9          A     Paul Joseph Orfanedes.

10                   THE COURT:  Move the microphone up a little closer

11     or push it up.

12                   MR. DRISCOLL:  Sorry.

13                   THE COURT:  There you go.

14     BY MR. DRISCOLL:

15         Q     Mr. Orfanedes, I would like to take you back to

16     the time period of May of 2006.  Do you recall the events

17     that led to Mr. Klayman leaving Judicial Watch?

18         A     Yes, I do, quite vividly.  It was early May.  I

19     had just returned from visiting Peter Paul in jail, in

20     prison, in Brazil.  So I think it was around May 7th or

21     so.

22         Q     Okay.  And you've heard Mr. Klayman state that the

23     reason he left Judicial Watch was to run for the U.S.

24     Senate.  Do you recall that?

25         A     Yes.

1      Q    Now, do you consider that statement to be true?

2      A    No.

3      Q    Why not?

4      A    Mr. Klayman didn't leave to run for the Senate.

5  He ran -- he left rather than face an internal investigation

6  into whether he misused Judicial Watch's resources, whether

7  he pursued an inappropriate relationship with a Judicial

8  Watch employee, and whether he was engaging in -- he engaged

9  in a domestic abuse.

10     Q    And how did you --

11     MR. KLAYMAN:  He can't put himself into my mind.

12     THE COURT:  No.  He's not saying that.  He's

13  talking about the information that they had in terms of why

14  he's disputing -- why you indicated -- overruled.  Sit down.

15     MR. KLAYMAN:  Let me make an objection.

16     THE COURT:  Sir, sit down.  You've made your

17  objection.  I know what you're talking about.

18     MR. KLAYMAN:  I want to specify.  I'm not going to

19  do a speaking objection.

20     THE COURT:  Mr. Klayman.

21     MR. KLAYMAN:  All right.

22     THE COURT:  Go ahead.

23  BY MR. DRISCOLL:

24     Q    So how did you come to know that -- or how did you

25  learn of these infractions that you just discussed?

1        A    I believe it was my first day back from my trip to

2    Brazil.  It was in the morning.  Mr. Klayman came into my

3    office, and he was in a complete panic.  I had never seen

4    him in such a state of anxiety.  He said to me something to

5    the effect of "I'm in trouble now.  I'm in big trouble.

6    Where is Tom?  Get Tom."

7        Q    What did you do then?

8        A    I went and got Tom.

9        Q    Did Mr. Klayman explain what the big trouble was?

10       A    Yes, he did.  He said that a day or so before his

11   wife had filed a complaint seeking divorce, a complaint of

12   divorce in Virginia, and that document was on the public

13   record, meaning anyone could see it, and he showed me a copy

14   of it.

15       Q    Okay.  Could I have you turn to Defense Exhibit 3?

16       A    Yes.

17       Q    Could you identify Defense Exhibit 3 for the

18   record?

19       A    Yes.  This is the bill of complaint that Mr.

20   Klayman showed me in early May 2003.

21       Q    And at the time that Mr. Klayman showed you the

22   complaint, did you read it?

23       A    Yes, I did.

24       Q    And?

25            MR. DRISCOLL:  Your Honor, at this point I would

1    like to move -- I'm sorry -- move the admission of

2    Defendant's Exhibit 3.

3              THE COURT:  Mr. Klayman?

4              MR. KLAYMAN:  Your Honor, I object to it.  It's

5    irrelevant.

6              THE COURT:  I don't think it's -- if the objection

7    is based on relevance, then I'll admit it.

8              MR. KLAYMAN:  And it's prejudicial, Your Honor.

9              THE COURT:  I've already made a ruling on that.

10   BY MR. DRISCOLL:

11       Q    Mr. Orfanedes, was there anything in particular

12   that stood out when you reviewed the complaint?

13       A    Yes, it was.  Paragraph 6, in particular.  There

14   are at least two subparagraphs, subparagraphs 6A and 6B.

15   Okay.

16       Q    Okay.  This is a paragraph that refers to the

17   grounds for divorce, correct?

18       A    Yes, it does.

19       Q    And what was it about 6A and B that you took

20   particular note of?

21       A    6A discusses -- alleged at the time Mr. Klayman

22   was -- apparently told his wife, Stephanie, that he was in

23   love with an adult female, an identity -- a person known to

24   both of them, that they had spent time together on trips.

25   That he had bought expensive jewelry for her and gave her

1    sums of money.

2         Mr. Klayman confirmed to me on that day that that

3    individual was a Judicial Watch employee, who I can name if

4    we need to.

5    Q    I don't think that's necessary at this point.

6         THE COURT:  I would agree.

7         THE WITNESS:  Mr. Klayman explained to me -- well,

8    first of all, this employee was someone that I knew Mr.

9    Klayman had traveled extensively with.  I remember trips to

10   California.  I remember trips he took to Florida.  I

11   remember trips he took with her to Texas, among other

12   places.  We discussed this individual.  Mr. Klayman told me

13   that -- confirmed to me and Tom that he was in love with

14   her, that he wanted to have a sexual relationship with her,

15   but he had not yet done so.  He said that.  He acknowledged

16   kissing her on the forehead.  He acknowledged buying her

17   gifts, I believe a gold cross worth a lot of money.

18        This individual also was someone who he had

19   recommended for various salary increases.  He had asked that

20   we agree that she be given check-signing authority at

21   Judicial Watch.  The trips that I mentioned to California,

22   to Florida and other places were allegedly on Judicial Watch

23   business, but it became clear that it was, perhaps, in

24   pursuit of a romantic relationship rather than for any

25   reason, any legitimate reason having to do with Judicial

1   Watch business.

2       Q    What was it about that circumstance that caused

3   you concern?

4       A    Well, I had two concerns.  One was that the monies

5   that were spent by Mr. Klayman traveling with this

6   individual, potentially buying her gifts or giving her --

7   because there was an allegation that he gave her sums of

8   money that were Judicial Watch monies.  So I was concerned

9   that Judicial Watch monies were being used inappropriately

10  in furtherance of Mr. Klayman's romantic interest with the

11  employee.

12      Q    Was that the only thing that you were concerned

13  about?

14      A    Well, no.  I was obviously concerned that we could

15  be subject to some sort of sexual harassment allegations or

16  lawsuit.  I wasn't sure if these were welcomed advances by

17  Mr. Klayman.  Obviously, that's an issue when you have

18  someone -- he was, at the time, a treasurer and on the board

19  of directors.  He used the title chairman.  Obviously,

20  there's a power relationship there.  That's the kind of

21  situation that is always, you know, of great concern when

22  there's, perhaps, a romantic relationship or -- there is a

23  question about whether these are unreciprocated.  So I was

24  very concerned about potential sexual harassment

25  allegations.

1    I was also very concerned about how the

2  organization would appear to the public if these allegations

3  were to come out, and it would also -- and the organization

4  had not taken any steps to deal with them in an appropriate

5  manner.

6    Q    Okay.  Now, referring your attention to paragraph

7  6B, which refers to an incident with Mr. Klayman's wife.

8  Did Mr. Klayman say anything about that?

9    A    Yes, he did.  I remember this allegation.  It was

10  an allegation at the time, but he acknowledged that he had

11  had an argument with his wife at the time in a car in a

12  church parking lot and that during the course of that, that

13  he punched the -- he threw his fist, and he broke his hand

14  on the dashboard radio.  I had remembered that at the time

15  because Mr. Klayman had come to work one day -- this was --

16  had been several months previously with a broken hand.  I

17  asked him what happened.  He told me he broke it moving a

18  piece of furniture.

19    So fast forwarding again to May.  I asked him

20  about that again, and he confirmed to me that that was --

21  that that had not been correct, what he told me earlier;

22  that he broke his hand in the manner that was described in

23  paragraph B6 -- or I'm sorry, 6B.

24    Q    Now, 6B also refers to an incident where it's

25  alleged that Mr. Klayman grabbed his former spouse around

1  the neck and shook her repeatedly in front of the party's

2  children while in the car.

3           Did Mr. Klayman say anything about that?

4      A    I don't remember him mentioning shaking her by the

5  neck or any of that, or the presence of the children.  That

6  was in the allegation, and what he described and what he

7  acknowledged to me was very similar to what was in paragraph

8  B, 6B.

9      Q    Okay.  Now, after this discussion with Mr.

10 Klayman, what steps, if any, did Judicial Watch take?

11     A    Well, most immediately what happened was that Mr.

12 Klayman -- we discussed -- Mr. Klayman was very concerned

13 about getting this complaint under seal.  So he went off and

14 I believe he had lawyers at the time, and he contacted -- my

15 understanding is he contacted them and succeeded in having

16 the bill of complaint put under seal.

17           After that, Mr. Fitton and Mr. Klayman and I

18 wanted to leave the office to discuss this.  We didn't want

19 to discuss this internally because, you know, we didn't --

20 we just thought it would be better if we discussed it in

21 private outside of the office.  So we went to a local

22 restaurant, Vie de France.  We had lunch.  At that

23 circumstance, it was a very ugly, ugly, ugly meeting.  Mr.

24 Fitton told Mr. Klayman he needed to resign.  There was a

25 lot of -- it was a lot of argument.  I remember Mr. Fitton

 1    saying, "You need to resign."

 2              I remember Mr. Klayman saying, "You're not the

 3    Pope."  Things to that effect.

 4              That basically was the beginning of the end.  That

 5    is -- at that point in time, Mr. Klayman -- well, my

 6    position was that we needed to at least investigate these

 7    allegations to find out, you know, if there was a basis for

 8    them.  Mr. Klayman had confirmed them in large part --

 9              MR. KLAYMAN:  Your Honor, I ask the question --

10    this is a narrative.  You prevented me from narratives.  I

11    ask there be questions here.

12              MR. DRISCOLL:  Sure.

13              THE COURT:  Okay.  Why don't you break it up then.

14    BY MR. DRISCOLL:

15        Q    During the meeting, was there any discussion

16    regarding how Mr. Klayman's relationship with Judicial Watch

17    would be handled over the next several days, weeks, or

18    months?

19        A    Well, the immediate discussion was whether Mr.

20    Klayman resigned or whether we would conduct an

21    investigation.  Mr. Klayman said he would prefer to resign,

22    enter into severance negotiations, rather than face an

23    internal investigation, which to me was further confirmation

24    that the allegations were true.

25        Q    Now, did that happen at the meeting, or was

1   that -- I mean, did that occur while you were at Vie de

2   France?

3        A    It was all around that same time period.  I don't

4   remember if it was at Vie de France, but it was shortly

5   thereafterwards that you know we contacted our counsel.  Mr.

6   Klayman had contacted counsel.  We set up some meetings and

7   that's when the severance negotiation discussions began.

8        Q    Okay.  Now, what was Mr. Klayman's status at

9   Judicial Watch during the severance negotiations?

10        A    Technically, he was supposed to be on a leave of

11   absence.  We had a Miami office, which you've heard

12   something about.  Mr. Klayman went down to Miami to sort of

13   get away from the Washington, D.C. office while these

14   negotiations were going on.

15        Q    And did Judicial Watch undertake any

16   investigations following Mr. Klayman's departure from the

17   office?

18        A    Not at that time.  I think the focus of the

19   efforts at the time was the severance negotiations, which

20   ended up taking quite a few months and were very

21   contentious.

22        Q    When you say "contentious," we've heard previously

23   about the threats of termination by both parties.  Were

24   there any other hostile words exchanged between the parties?

25        A    Fairly continuous.  I remember one instance.  Our

1  professional liability insurance is due around July 29th,

2  which is the anniversary.  So the 29th of every year.  And

3  we were having difficulty -- professional liability

4  insurance is fairly expensive, and we needed to move some

5  money around.  So we were moving money from one account to

6  basically our checking account, our operating account, so

7  that we could pay the professional liability insurance.  Mr.

8  Klayman countermanded Mr. Fitton's request that the bank

9  transfer the money, effectively preventing us from paying

10 for our professional liability insurance, which can have

11 substantial consequences for an organization if you have a

12 gap in coverage.

13         So there was -- there was a great deal of

14 hostility.  There was these threats.  Mr. Klayman threatened

15 to fire Mr. Fitton and I.  We -- I believe I talked about

16 the -- testified earlier about the documents we prepared to

17 remove Mr. Klayman from the board and for him to be fired as

18 president.  All this was going on July, August time period.

19    Q    And by September 19th, 2003, the severance

20 agreement was fully negotiated and signed, correct?

21    A    Yes, that's correct.

22    Q    After the severance agreement was signed -- and if

23 I could just have you turn to Defense Exhibit No. 1?

24    A    Yes.

25    Q    There are certain provisions in the severance

# EXHIBIT B

1   Stone, if that's his -- yeah.

2              MR. DRISCOLL:  Okay.  I have no further questions.

3              THE COURT:  All right.  Sir, you're excused at

4   this time.

5              THE WITNESS:  Thank you.  Thank you, Your Honor.

6              THE COURT:  All right.  Your next witness.

7              MR. DRISCOLL:  Defendants call to the stand

8   Mr. Tom Fitton.

9              THE COURT:  All right.  Mr. Fitton, I'm not going

10  to swear you in again.  Just remember that you're under

11  oath.

12             THE WITNESS:  Yes.

13             THOMAS FITTON, WITNESS, PREVIOUSLY SWORN

14                    DIRECT EXAMINATION

15  BY MR. DRISCOLL:

16       Q    Good afternoon, Mr. Fitton.

17       A    Good afternoon.

18       Q    I would like to take you to May of 2006.  Do you

19  recall a meeting together with Mr. Orfanedes and Mr. Klayman

20  regarding his divorce?

21       A    Yes.

22       Q    Okay.  How did that meeting start?

23       A    I recall -- I was called into Larry's office and

24  Paul was there.  Larry disclosed this agreement to us.

25  There may have been other materials, too.  And as we heard

1   in the previous testimony, the document says what it says.

2   He admitted he was pursuing a romantic relationship with our

3   former chief of staff.  He couldn't help but fall in love

4   with people who did things for him.  He admitted about the

5   assaulting his wife or touching his wife or putting his hand

6   around her throat or something like that and breaking his

7   hand by banging it on the dashboard.  It was pretty

8   shocking.

9        Q    And after the meeting -- or how long did that

10   meeting take place?

11        A    I don't remember the length of time.  He was very

12   concerned about it being in the public domain, and it was

13   under seal.  I think Larry had sued -- filed a divorce --

14   we're going back.  He had done the weird thing with Haiti.

15   He backed off from doing that.  Evidently, he had filed for

16   divorce in Florida shortly beforehand which precipitated

17   Mrs. Klayman, at the time, filing the thing in Virginia, and

18   he was desperate to get it under seal.  That's generally

19   what I remember.

20        Q    You just mentioned Haiti.  What is the issue with

21   Haiti?

22             MR. KLAYMAN:  Objection.  Relevance, Your Honor.

23             THE COURT:  Does it relate to what we're talking

24   about in terms of this conversation that they had with Mr.

25   Klayman?

1          MR. DRISCOLL:  I don't know.  He said that there

2     was the issue with Haiti, and I, frankly, don't know.

3          MR. KLAYMAN:  Same objection.

4          THE COURT:  Well, you're indicating relevance.  He

5     brought it up in the context -- does it have something to

6     do -- let me just ask this -- something to do with the

7     conversation that you had with Mr. Klayman around these

8     issues?

9          MR. KLAYMAN:  Your Honor, if Mr. Fitton's lawyer

10    doesn't even know about it, how can it be relevant?

11         THE COURT:  Because he raised it.  He evidently

12    brought it up.  It doesn't mean it's not relevant.

13         MR. KLAYMAN:  I'm just making a legal objection.

14         THE COURT:  Excuse me.  All I'm asking is -- you

15    raised it, but is it related to the issues you're talking

16    about, or is this something else?  If it's something else,

17    we don't need to get into it.

18         THE WITNESS:  It was related in the sense that

19    Mr. Klayman was seeking a divorce from Mrs. Klayman.  He

20    initially sought to do something in Haiti.  Evidently, then,

21    he did it in Florida which precipitated the event of the

22    filing by Mrs. Klayman in Virginia.

23    BY MR. DRISCOLL:

24         Q    Could I have you turn to Defendant's Exhibit 3,

25    please?

A     Yes.  I have it.

Q     Now, you mentioned documents being exchanged during the meeting.  Was this one of the documents that was exchanged during the meeting?

A     It seems to be.

Q     Okay.  Now, do you recall Mr. Klayman's demeanor during the meeting?

A     He was -- not really.  I just remember him being anxious.  The meeting took place 15 years ago.

Q     Okay.  Do you recall anything that you said to Mr. Klayman at that time?

A     I remember shaking my head, laughing nervously. The meeting broke up.

Q     What happened after the meeting broke up?

A     I don't remember what happened at the office.  I know I went home.  I came back to the office the next day, and we decided to go to lunch at this Vie de France, and then I told Larry he needed to resign.  I didn't want him signing our fundraising letters anymore.

Q     Why did you tell Mr. Klayman that he needed to resign?

A     He had lied to us.  It was misconduct.  We had done all this work on Bill Clinton, representing women who had been abused by Bill Clinton.  I mean, it was just a nightmare from -- for an organization that was doing the

1   work we're doing to have the head of the organization

2   admittedly doing what he said he did, which was pursuing a

3   romantic affair with his chief of staff.   All sorts of

4   business decisions were impacted as a result of questions I

5   had.

6           He was doing things as it relates to the status of

7   employment -- the chief of staff's employment that I had

8   agreed to, thinking that there was a business reason for.

9   And what a fool I was?  He was pursuing a romantic

10  relationship with her, and that was outrageous.   There were

11  other staff that could have been impacted in retrospect,

12  based on Larry's romantic attachment to this woman.   In

13  addition to the publicity surrounding having him engaged in

14  this conduct, I didn't want him anywhere around Judicial

15  Watch from there on in.

16      Q    Could I have you take a look at Defendant's

17  Exhibit -- well, let me back up first.   Let's cover the

18  issues at the lunch meeting.

19          After you told Mr. Klayman that you felt that he

20  should resign, how did he react?

21      A    I don't remember.   I mean, I heard Mr. Orfanedes'

22  testimony about -- you know, if he said that, it wouldn't

23  surprise me.   I could picture him saying it, but I don't

24  remember him saying it.

25      Q    Okay.   Do you recall whether the tone was friendly

1    or anything else?

2         A     Well, what I had to say was not a pleasant thing

3    to say.  I was upset.  I think he was defensive.  I think

4    the tone was what you would expect it to be for that type of

5    meeting.  We had worked together for several years, and it

6    was ending.

7         Q     Okay.  Now, during the meeting, or at any time

8    after the meeting until Mr. Klayman withdrew from Judicial

9    Watch in September of 2003, did Mr. Klayman ever express any

10   remorse to you?

11        MR. KLAYMAN:  Your Honor, that presumes facts not

12   in evidence.  Can I approach sidebar?

13        (Bench conference.)

14        THE COURT:  I think the remorse has to be more

15   specific.  There's remorse that they perceived as damage to

16   Judicial Watch.  Remorse about what allegedly what happened?

17        MR. DRISCOLL:  I can do that.

18        THE COURT:  I mean, it's too unspecific.

19        MR. KLAYMAN:  That presumes that I did what he

20   said I did, so it lacks a foundation.  How can he express

21   remorse for something he never did?

22        THE COURT:  Well, what are you asking?  Are you

23   asking about Judicial Watch, or are you asking about the

24   history?

25        MR. DRISCOLL:  I'm asking a series of questions.

1    I will ask about remorse regarding the incident with his

2    wife.  I will ask about remorse regarding the exposure that

3    Judicial Watch may have incurred.

4            THE COURT:  I think in terms of the wife, since

5    he, obviously, evidently disputes this --

6            MR. DRISCOLL:  Yeah.  But the testimony is that he

7    admitted it to him.

8            THE COURT:  Right.  I forgot about that.

9            MR. KLAYMAN:  It assumes -- it pulls facts upon

10   facts, okay, which have been disputed.

11           THE COURT:  You need to dispute it now.  According

12   to them -- so I think there's a foundation.  According to

13   both Mr. Orfanedes and, evidently, Mr. Fitton, you evidently

14   admitted to conduct that is set out in the bill of

15   complaint.

16           So that is the facts.  You can dispute it, but

17   that is the facts.  And based on that, did they perceive

18   that there was a feeling of remorse when he supposedly

19   admitted this.  Okay.  You need to separate out Judicial

20   Watch.  It is too broad otherwise.

21           MR. DRISCOLL:  I'll make it very specific.

22           MR. KLAYMAN:  As far as -- give me some leeway on

23   cross, Your Honor.

24           THE COURT:  Well, it depends.

25       (In open court.)

BY MR. DRISCOLL:

Q    Between the period of time when Mr. Klayman disclosed his wife's divorce complaint and the date that the severance agreement was executed, did Mr. Klayman ever express any remorse to you regarding the incident with his wife?

A    No.  It was the exact opposite.  He accused us of being holier than thou.  At one point, he called me at home. There was still a concern about whether the document would be under seal, and he wanted to issue a statement attacking his wife.  And I was, like, "Larry, you really don't understand what's going on here, do you?"

And I just -- I just couldn't believe it.  I just couldn't believe it.

Q    Now, with regard to the incident with his wife, did Mr. Klayman confirm that the incident actually occurred?

A    The incident being what?

Q    The assault on his wife?

A    Well, the document alleges something specific.  I mean, he admitted to touching her or grabbing her or something like that.  He didn't say, "I throttled her" as suggested in the divorce filing, but he confirmed it enough for me to know that something had happened that was violent.

Q    Okay.  Now, during that same period, the time between the meeting in May and the execution of the

1     severance agreement in September, did he ever express any

2     remorse regarding the position that he put Judicial Watch

3     in, vis-a-vis the relationship with the chief of staff?

4             MR. KLAYMAN:  Triple compound question.  It

5     presumes facts not in evidence.

6             THE COURT:  No.  I think that's not correct.  So

7     in terms of the facts not in evidence.  But let me just

8     see -- no, I don't think it's a compound question.  Go

9     ahead.

10            MR. KLAYMAN:  Your Honor --

11            THE COURT:  It's not a compound question.

12            MR. KLAYMAN:  All right.

13            THE WITNESS:  No.

14    BY MR. DRISCOLL:

15       Q    Okay.  Now, independent of the meeting and the

16    conversations that were had in May of 2003, do you have any

17    recollection regarding Mr. Klayman injuring his hand?  In

18    other words, did you observe an injured hand?

19       A    Yes.

20       Q    Okay.  And did you ask Mr. Klayman how it

21    occurred?

22       A    I don't recall if I asked.  I recall his telling

23    me that he injured it moving a table.

24       Q    Okay.  And during the meeting in May of 2003, did

25    he change that explanation?

1          MR. KLAYMAN:  Objection.  That calls for a

2     subjective analysis here.

3          THE COURT:  No.  It's not subjective.  It's

4     whatever he recalls, whether you said something different or

5     didn't say something different.

6          THE WITNESS:  I recall learning the hand injury

7     was a result of the attack on his wife.

8     BY MR. DRISCOLL:

9     Q    Okay.  Now, following the meeting in May of 2003,

10    did Mr. Klayman hire a lawyer?  Let me be more specific.

11    Did Mr. Klayman hire a lawyer to handle his relationship

12    with Judicial Watch?

13    A    Well, generally speaking, going back to that

14    initial meeting, I think it was agreed that we would bring

15    our lawyer into it, David Barmak.  And as has been

16    previously testified to, there was an issue whether a waiver

17    was required in order to bring him in by Mr. Klayman.  I

18    think Mr. Klayman agreed to the waiver.  And then eventually

19    Mr. Barmak then began representing Judicial Watch's interest

20    in this matter.

21    Q    When you say "in this matter," what do you mean?

22    A    What to do -- it became a personnel matter, or HR

23    matter, whatever you want to call it -- how to handle the

24    disclosures and what the company needed to do to either

25    investigate them or potentially remove Mr. Klayman from

1   employment.

2       Q    So how long did it happen after the May 2003

3   meeting that the relationship between Judicial Watch and

4   Mr. Klayman became a severance negotiation?

5       A    I think it became a severance negotiation in June.

6       Q    So in between May and June, what were the

7   negotiations regarding?

8       A    I don't know.  You know, that was just a terrible

9   time.  You're presuming the severance negotiations made it

10  more regular.  It did not.  It just increased the pressure.

11      Q    Okay.  Now, when Mr. Klayman entered into the

12  severance negotiation, it contained certain limitations on

13  his actions, correct?

14          THE COURT:  The severance agreement or something

15  else?

16          MR. DRISCOLL:  The severance agreement.

17          THE COURT:  Okay.

18          MR. KLAYMAN:  Objection.  The severance agreement

19  speaks for itself.

20          THE COURT:  I'll overrule that objection.

21          THE WITNESS:  I believe you asked about the

22  severance negotiations.  I don't know if it was tied to the

23  negotiations of the severance package or beforehand, where

24  Mr. Klayman agreed to absent himself from the office, from

25  at least the Washington, D.C. office.

# EXHIBIT C


**DEFENDANTS'
EXHIBIT**

**3**

Case No. 1:06-cv-670-CKK

VIRGINIA:

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

STEPHANIE LUCK KLAYMAN,          :
                                 :
          Complainant,           :
                                 :
v.                               :          IN CHANCERY NO. ___183946___
                                 :
LARRY ELLIOT KLAYMAN             :
12161 Abington Hall Place        :
Apartment 304                    :
Reston, Virginia 20190,          :
                                 :
          Defendant.             :

### BILL OF COMPLAINT

COMES NOW, the Complainant, STEPHANIE LUCK KLAYMAN, and states as follows:

1. That the Complainant is and has been for at least six months preceding the commencement of this suit an actual bona fide resident and domiciliary of the Commonwealth of Virginia.

2. That the Complainant and Defendant last cohabited as husband and wife in Great Falls, Virginia.

3. That the parties are over the age of eighteen years and neither is an active duty member of the Armed Forces of the United States of America.

4. That the parties were lawfully married on July 6, 1996 in Washington, D.C.

5. That two children were born of the marriage, namely, Isabelle Natalie Klayman, born on December 15, 1997 and Lance William Klayman born on November 14, 1999.

6. That during the marriage, the Defendant has pursued a course of cruel and

**DEPOSITION
EXHIBIT**
DeLuca-2
0 800-631-6989

abusive treatment against the Complainant, so as to indicate a withdrawal from and desertion of the marital relationship, and that caused Complainant to fear for her safety and well-being, to wit:

a. In March 2002, the Defendant informed the Complainant that he was in love with an adult female, whose identity is known to the parties. The Defendant and the adult female have spent time together on various trips to such places as California and Miami, Florida. Defendant bought expensive jewelry for the adult female during the parties' marriage and also gave her sums of money.

b. On or about May 26, 2002, the Defendant grabbed the Complainant's arm and grabbed her around the neck and shook her repeatedly in front of the parties' children while in their car in their church parking lot, and put his hand through the car radio, resulting in a broken hand.

c. The Defendant verbally and emotionally abused the Complainant during the marriage by degrading her and calling her names, including vulgar names, at times in front of the parties' children, and has threatened the Complainant that she is not to defy him or disobey his "rules". The Defendant has told the Complainant, on several occasions, that he does not love her.

d. The Defendant was extremely and irrationally controlling of the Complainant on a daily basis, including, but not limited to the following: forbidding the Complainant and the children from leaving the home at any time without security guards, constant telephone calls to Complainant throughout the day, inquiring as to her and the children's whereabouts, tracking her every move when the children are with her, and refusing to allow Complainant and the children to visit immediate family in Ohio

-2-

without being accompanied by security guards or himself.

e. The Defendant's emotional abuse of the Complainant and the minor children has caused the children considerable stress and anxiety.

7. The Defendant's above referenced acts of cruelty and desertion have destroyed the marital trust; jeopardized the financial integrity of the marital partnership; resulted in a breach and neglect of marital duties and responsibilities; caused the Complainant great emotional suffering; and demonstrate an unrelenting disregard for the Complainant's physical and emotional welfare. The Defendant's actions aforesaid have resulted in the practical destruction of home life in every true sense and have rendered the marriage intolerable and impossible for the Complainant to endure.

8. That there is no hope of reconciliation between the parties.

9. That the parties are possessed of certain marital property consisting of real and personal property, the ownership of which is in dispute.

10. That the parties are possessed of certain marital property consisting of personalty acquired during the marriage and titled in the names of both parties, the ownership of which is in dispute.

11. That the marital property includes certain assets acquired during the marriage which are not titled in the joint names of the parties, the ownership of which is in dispute.

12. That the parties are owing of certain marital debts acquired during the marriage for which the duty to pay is in dispute.

WHEREFORE, the Complainant, requests the following relief:

1. That a divorce a mensa et thoro be granted to the Complainant on the grounds

-3-

of cruelty and constructive desertion to be later merged into a divorce <u>a</u> <u>vinculo</u> <u>matrimonii</u>.

2. That custody of the minor children be awarded to Complainant both *pendente lite* and permanently;

3. That Complainant be awarded *pendente lite* and permanent support and maintenance for the minor children.

4. That Complainant be awarded pendente lite use and possession of the marital residence;

5. That Complainant be awarded temporary and permanent periodic and lump sum spousal support or, in the alternative, that she be granted a reservation of the right to seek spousal support in the future.

6. That the Court determine legal title to, ownership and value of, all real and personal property of the parties, ascertaining which is separate property, which is marital property, and which is part-marital and part-separate property.

7. That other marital real and personal property titled in the names of both parties be apportioned in kind between the parties as their legal and equitable interests may dictate or, in the alternative, that such property be partitioned and sold, with the proceeds to be divided among those entitled thereto.

8. That Complainant be granted a monetary award based upon the equities and the rights and interests of each of the parties in the property comprising the marital estate.

9. That Complainant be awarded one-half the marital share of all pension benefits to which the Complainant is or may become entitled.

-4-

10. That the debts of the parties be apportioned and ordered paid.

11. That pending a final determination of support and property issues, the Defendant be restrained and enjoined from selling, giving away, or otherwise disposing of or encumbering any assets, whether held jointly with Complainant, individually by the Defendant, or jointly by the Defendant with a third person.

13. That Complainant be awarded temporary and final attorney's fees and costs incurred in this litigation.

14. That Complainant be granted such other and further relief as the nature of the case may require or the Court in Equity may deem just and proper.

By: _Stephanie Luck Klayman_
STEPHANIE LUCK KLAYMAN

SUROVELL MARKLE ISAACS & LEVY PLC

By: _____

Dorothy M. Isaacs, Esquire
VSB #28818
4010 University Drive, Suite 200
Fairfax, Virginia 22030
Telephone: 703-251-5400
Facsimile: 703-591-2149
Counsel for Complainant

-5-

# EXHIBIT D

1        to the jury.)

2                         DIRECT EXAMINATION

3        BY MR. DRISCOLL:

4             Q    Beginning at page 9, line 6 through line 10.

5                  Your Honor, this has her home address.  Can I not

6        read that into the record?

7                  THE COURT:  Yes, you don't have to.

8                  MR. DRISCOLL:  Okay.  All right.

9        BY MR. DRISCOLL:

10            Q    Would you please state your address for the

11       record, please?  Your name and --

12            A    Sure.  My name is Stephanie DeLuca.

13            Q    Okay.  And line 16 on the same page through line

14       21 on page 10.

15                 Ms. DeLuca, you know Mr. Klayman, correct?

16            A    Yes, I do.

17            Q    How do you know Mr. Klayman?

18            A    I was married to him.

19            Q    You were married, I believe, it was in 1996; is

20       that correct?

21            A    Correct.  Yes, July.

22            Q    July of '96?

23            A    Yes.

24            Q    You were divorced in June of 2003?

25            A    I think it was June 23rd, 2003.

1   Q When did you meet Mr. Klayman?

2   A I met Mr. Klayman when I started working at his

3 law firm.  At the time, it was called Klayman & Gurley.  And

4 I started working there in April of 1989, and I think I met

5 him shortly thereafter.

6   Q In what capacity did you work for Klayman &

7 Gurley?

8   A I was hired as a legal assistant.

9   Q Were you an employee of Mr. Klayman's law firm at

10 the time that you commenced a relationship with him?

11   A Yes, I was.

12   Q And then you subsequently got married, correct?

13   A Yes.

14   Q Page 13, line 16 through page 14, line 3.

15   I would like to talk to you specifically about the

16 health insurance.  You said you had a family plan.  Are you

17 referring to family coverage for your children?

18   A Yes.

19   Q Did the family plan, or the family health coverage

20 that you procured through Judicial Watch, did that require

21 you to contribute a portion of the premium out of your

22 salary?

23   A I think, yes.  I think it did.

24   Q Line 20 on the same page.

25   MR. KLAYMAN:  This has nothing to do with the

1    counterclaim.  I object.

2              THE COURT:  I'm sorry?

3              MR. KLAYMAN:  This has nothing to do with their

4    counterclaims.  Relevancy.

5              THE COURT:  Okay.  Mr. Driscoll?

6              MR. KLAYMAN:  Can we do a sidebar?

7              THE COURT:  I'm letting Mr. Driscoll decide

8    whether he wants to go forward with this or move on to

9    something else.

10             We can talk to you on the side.

11             MR. DRISCOLL:  Let's have a sidebar, Your Honor.

12             THE COURT:  Okay.

13        (Bench conference.)

14             MR. DRISCOLL:  Throughout our directs on this

15   particular -- these claims on the counterclaims, Mr. Klayman

16   kept pointing out that we were trying to hurt his family,

17   and he articulated that in questions, and it's in the

18   letters also.

19             THE COURT:  Which letters?

20             MR. DRISCOLL:  The Saving Judicial Watch letters,

21   that Tom Fitton tried to harm him and his family.

22             MR. KLAYMAN:  That's very attenuated as to whether

23   money is being taken out of a check or not.

24             THE COURT:  But the harm was not paying the health

25   insurance, right?  I mean, that's what you considered the

1    harm, right?

2              MR. KLAYMAN:  Yes.

3              THE COURT:  To you and your family?

4              MR. KLAYMAN:  Yes.

5              THE COURT:  All right.  I'll allow it.  Does it go

6    much further?

7              MR. DRISCOLL:  That's it.  Then we are done.

8              THE COURT:  All right.  I'll allow it.

9         (In open court.)

10             MR. DRISCOLL:  The next excerpt is on page 14,

11   line 20 through page 15 line 3.

12             Your Honor, I misspoke.  This also relates to the

13   same issue.

14             THE COURT:  All right.  I think if this is the

15   limited amount, I'll allow it.

16   BY MR. DRISCOLL:

17        Q    Following your separation from Judicial Watch,

18   Mr. Klayman contends that Judicial Watch's board of

19   directors met and came to an agreement to cover his family's

20   health insurance.  Did he ever communicate to you about

21   that?

22        A    No, he did not.

23        Q    The next excerpt begins on page 25, line 20

24   through page 26, line 16.

25             Did you know a Judicial Watch employee named X?

1    A    Yes.

2    Q    How did you know her?

3    A    She was the office manager.

4    Q    Did you have a friendly relationship with her?

5    A    It was cordial, yes.

6    Q    When did you meet her?

7    A    Maybe around the year -- I think maybe 2000, 2001.

8    Q    What was your understanding of Mr. Klayman's

9    relationship with Ms. X?

10    A    Well, he hired her.  They were -- you know, she

11    was an employee of Judicial Watch.  He hired her to run the

12    office, and they later had a relationship, personal

13    relationship.

14    Q    Okay.  Page 27, line 1 through line 18.

15         What do you mean by "personal relationship"?

16    A    They were seeing each other.

17    Q    And how do you know this?

18    A    During the time we were married, Mr. Klayman told

19    me that he was in love with her, and he had feelings for

20    her, so ...

21    Q    Did you ever observe the two of them together?

22    A    Yes, I did.

23    Q    In what type of circumstance?

24    A    At the office together in either one of their

25    offices laughing or talking.  I mean, I noticed it was

1    definitely much more than professional.

2         Q    Okay.  Page 28, line 20 through page 29, line 22.

3    Actually, through line 14 on page 30.

4              If I could have you take a look at Exhibit No. 2

5    and identify that document for me.

6         A    Yes.  This is the original divorce complaint that

7    I filed in Fairfax County.

8         Q    You'll notice that in the upper right-hand corner

9    of Exhibit 2, there is a date stamp with the Circuit Court

10   that indicates it was filed on May 5th.  Is that

11   consistent with your recollection?

12        A    Yes.  I'm not sure if it's 5 or 6.  I can't tell.

13        Q    Did you provide a copy of Exhibit No. 2, the bill

14   of complaint, to Mr. Klayman?

15        A    I believe my attorney served it on him, yes.

16        Q    If I could have you take a look at paragraph 6A,

17   please.  Just briefly review paragraph 6A.

18        A    Okay.

19        Q    Do you know who the adult female whose identity is

20   known to the parties, do you know who you're referencing in

21   paragraph 6A?

22        A    Yes.  Yes.

23        Q    Go ahead.

24        A    Yes.  The adult female that I was referring to was

25   Judicial Watch employee X.

1      Q     Okay.  You allege here in this paragraph that they

2   spent time together on various trips to places such as

3   California and Miami.  How do you know that?

4      A     Because Mr. Klayman told me they were going on

5   trips.

6      Q     Page 31, line 2 through line 12.

7            You referred to expensive jewelry.  Do you know

8   what the jewelry was?

9      A     Yes.  It was a cross with jewels on it.  A big

10  cross.

11     Q     Do you know where it was purchased?

12     A     It was purchased overseas.  I think maybe in

13  Paris.

14     Q     Was it purchased with a Judicial Watch credit card

15  or with a personal credit card?

16     A     That I do not know.  I do know I saw the receipt

17  at one point.

18     Q     Page 33, line 22 through page 36, line 9.

19           Paragraph 6B of Exhibit 2 refers to an incident

20  at -- it says "church - church parking lot."  Could you tell

21  me what the church was.  What church parking lot?

22     A      It was the church that I attended, a Catholic

23  church on Springvale Road in Great Falls, Virginia called

24  St. Catherine's.  We lived on the same street.  It was down

25  the street.

1      Q   In your own words, will you briefly recount for me

2  what happened on May 26th, 2002?

3      A   Sure.  Mr. Klayman came over that morning, and I

4  had talked to him on the phone earlier, and he had -- I told

5  him I wanted to take Isabel to church with me, and I was

6  under the understanding that he would stay at the house with

7  Lance.

8           When he got to the house, he said that he was

9  going to go to church with us.

10           We got into an argument because he saw that I

11  wasn't allowed to take the children out of the house by

12  myself at any time.  He didn't understand why I thought that

13  I could do this on this day, and I said that I thought that

14  that's what we had talked about on the phone, but obviously

15  that wasn't the case.

16           So he got into the car with me and the children.

17  Put the children in, and we -- on the way to church, he

18  was -- we were arguing with each other about the security

19  restraints, and I found it ridiculous that I couldn't go to

20  church with my two kids without body guards.  He started to

21  just yell at me and call me names, that I was stupid for

22  thinking I could, you know, defy him.  And he got very

23  angry, and he put his hands around my neck, and he started

24  to shake me and bang my head against the car window.

25      Q   Were you driving at the time?

1      A     I was in the passenger seat, and he was in the

2   driver seat.  The children were in the car, and my daughter

3   was very upset.

4      Q     You also state that he put his hand through the

5   car radio resulting in a broken hand?

6      A     He did.  We never obviously made it into the

7   church.  He pulled the car out.  I told him just to take me

8   home, and I'm not sure if he put his hand through the car

9   radio in the church.  It might have been in our driveway.

10  He punched his hand into the radio, and it was bloody, and

11  it was bashed in.  Yes, we found out later it was broken.

12     Q     Page 38, line 3 through line 10.

13           6C refers to the allegation that Mr. Klayman

14  called you vulgar names in front of the children.  If you

15  don't want to repeat them, you could spell them.  Could you

16  tell me what the names were?

17           MR. KLAYMAN:  Objection.  Relevancy.

18  Notwithstanding I refute these claims, this has nothing to

19  do with anything.

20           MR. DRISCOLL:  Well, Mr. Klayman will have his

21  opportunity to testify.

22           THE COURT:  Okay.  Why don't you come to the side.

23        (Bench conference.)

24           MR. KLAYMAN:  It's just an effort to smear me.  It

25  has nothing to do with this case.

1          MR. DRISCOLL:  This is just what he did, I mean,

2     according to his wife.  She put the allegations in the

3     complaint.  The complaint was handed to Mr. Fitton and

4     Mr. Orfanedes.  I'm exploring the basis of the allegations

5     with the individual who made them.

6          THE COURT:  I think I'll allow it based on, I

7     think, what your testimony is going to be about her.

8          MR. KLAYMAN:  All right.  I'll refute it.

9          (In open court.)

10          THE COURT:  Go ahead.

11     BY MR. DRISCOLL:

12     Q     Could you tell me what the names were?

13     A     Okay.  Well, there were so many.  He called me a

14     piece of shit, a dumb ass, ugly, stupid.  Bitch was one that

15     he liked to use.

16     Q     Page 39, line 18 through page 40, line 12.

17          I'm showing you now what's been marked as DeLuca

18     Exhibit 3.  Would you identify this document for the record?

19     A     Sure.  It's an order that was filed in the

20     Fairfax County Court.

21     Q     This is the order that dismissed the divorce

22     action in which Exhibit No. 2 made the allegations that

23     we've been discussing here today; is that correct?

24     A     Yes, that's correct.

25     Q     Paragraph 1 of the order states that, "The parties

1    hereby withdraw their respective allegations in the bill of

2    complaint for divorce."

3            By withdrawing your allegations, did you intend to

4    mean that the allegations were not true?

5        A    Absolutely not.

6        Q    Page 52, line 12 through page 53 line 9.

7            Ms. DeLuca, since your divorce from Mr. Klayman,

8    there's been a number of litigations between you and your

9    ex-husband, correct?

10           MR. KLAYMAN:  Objection.  Relevancy.  This has

11   nothing to do with this case.

12           THE COURT:  I think in terms of -- well, let me --

13   come to the side.

14       (Bench conference.)

15           THE COURT:  I think I had taken out the litigation

16   against the husband.

17           MR. DRISCOLL:  I think you took out the comment

18   of he uses litigation as a weapon.

19           THE COURT:  Okay.  That's right.  That's what I

20   took out.

21           So what's the context?

22           MR. DRISCOLL:  It just describes Mr. Klayman's

23   relationship with his wife and how he treated her after the

24   divorce.

25           MR. KLAYMAN:  That didn't come in front of them.

1   I was gone by then.  This has no relevancy.  This has

2   nothing to do with my leaving Judicial Watch as they allege.

3         MR. DRISCOLL:  That's actually true, but it's

4   still the course of conduct.

5         THE COURT:  I think in the context of since it's

6   going to be a dispute, you're going to claim that your wife

7   lied in the materials, et cetera, I think the relationship,

8   in terms of what else -- or you might have in the case or

9   she might have in the case in terms of litigation.  So I'll

10   allow it.

11         MR. KLAYMAN:  Your Honor, there was no litigation

12   over the lying.  I didn't sue her for defamation.

13         THE COURT:  No.

14         MR. KLAYMAN:  There's no relevance to this.

15         THE COURT:  No.  I'm just saying that there is a

16   dispute as to whether she lied in the paper and they lied.

17         I'm saying in terms of -- lawsuits back and forth,

18   there were certainly possibilities for bias on your part or,

19   frankly, bias on her part, in which case they can consider

20   it in that context.

21      (In open court.)

22   BY MR. DRISCOLL:

23      Q    Beginning at line 12 on page 52.

24         Ms. DeLuca, since your divorce from Mr. Klayman,

25   there's been a number of litigations between you and your

1    ex-husband, correct?

2         A    Correct.

3         Q    He has filed an action in Florida against you,

4    correct?

5         A    Yes.

6         Q    He filed an action here in Ohio against you,

7    correct?

8         A    Yes.

9         Q    And he also filed a custody dispute in Ohio,

10   correct?

11        A    Yes.

12        Q    Are there any other lawsuits that Mr. Klayman has

13   filed against you since your divorce?

14        A    He filed -- sued me twice in Florida.

15        Q    When was the first one?

16        A    It was right after my marriage.  It was July of

17   '03.  I mean, '07.

18        Q    Okay.  Line 20 on the same page.  53 through line

19   15 on page 54.

20             What is your understanding of Mr. Klayman's

21   separation from Judicial Watch?

22        A    He blamed it on me.

23        Q    When you say he blamed it on you, what do you

24   mean?

25        A    Because I filed a divorce complaint with the

1    allegations, and he told me that he went to the board of

2    directors of Judicial Watch with that complaint.

3         Q    Did he tell you anything else about what

4    transpired when he took the complaint to the board of

5    directors?

6         A    He said they were very upset and asked him to

7    leave.

8         Q    Actually, I don't think that's accurate.

9         A    I'm sorry.  Let me do that again.

10             He said they were upset and asked him to leave.

11        Q    Page 102, lines 16 and 17.

12             THE COURT:  Okay.  Wait a second.

13             Okay.  Go ahead.

14   BY MR. DRISCOLL:

15        Q    This is cross-examination by Mr. Klayman through

16   page 103, line 8.

17             You're not making an allegation here that I had a

18   sexual affair with Ms. X, are you?

19        A    You told me you were thinking of having sex with

20   her.  So I assumed there was something going on.

21        Q    Notwithstanding the falsity of that, I never told

22   you I did have sex with her, did I?

23        A    No.  You told me you wanted to, and that you were

24   in love with her.

25             MR. DRISCOLL:  That concludes the testimony,

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LARRY KLAYMAN,<br><br>      Plaintiff,<br><br>   v.<br><br>JUDICIAL WATCH, INC., *et al.*,<br><br>      Defendants. | Civil Action No. 06-670 (CKK) |

## FINAL JUDGMENT
(March 18, 2019)

This case was resolved in part by the Court and in part by jury verdict. In the interest of consolidating the respective determinations in a final appealable Order, it is hereby

**ORDERED** that, pursuant to the verdict and prior decisions of this Court, Plaintiff Larry Klayman not recover for any of his claims against Defendant Judicial Watch, Inc., or any defendants previously part of this action; and it is further

**ORDERED** that, pursuant to the verdict, Counter-Plaintiff Judicial Watch, Inc. recover as a judgment $2,300,000.00 from Counter-Defendant Larry Klayman, inclusive of prejudgment interest as to Count II of the Amended Counterclaim; that, pursuant to summary judgment as to Count I, Counter-Plaintiff Judicial Watch, Inc. recover damages of $69,358.48 and, as of March 18, 2019, prejudgment interest of $63,611.68, for a total recovery under Count I of $132,970.16 from Counter-Defendant Larry Klayman; and that Counter-Plaintiff Judicial Watch, Inc. have and recover costs from Counter-Defendant Larry Klayman.

**ORDERED** that, pursuant to the verdict, Counter-Plaintiff Thomas J. Fitton recover as a judgment $500,000.00 from Counter-Defendant Larry Klayman and that Counter-Plaintiff Thomas J. Fitton have and recover costs from Counter-Defendant Larry Klayman.

**SO ORDERED.**

**This is a final appealable Order.**

Dated: March 18, 2019

                           /s/                             
                           COLLEEN KOLLAR-KOTELLY
                           United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN,
  Plaintiff/Counterdefendant,
  v.
JUDICIAL WATCH, INC., *et al.*,
  Defendants/Counterplaintiffs.

Civil Action No. 06-00670
Judge Colleen Kollar-Kotelly

## JURY VERDICT FORM

### WE, THE JURY, UNANIMOUSLY FIND AS FOLLOWS:

Larry Klayman v. Judicial Watch

Plaintiff Larry Klayman:

1.  Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that Defendant Judicial Watch, Inc. breached the Confidential Severance Agreement by failing to make a good faith effort to remove him as the guarantor of a lease for Judicial Watch, Inc.'s headquarters? (See Claim No. 1 on page 27 of the Jury Instructions.)

_____ YES    __X__ NO

a.  If yes, designate the type of breach:

_____ Material    _____ Simple

a.  If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

Answer: _____

(N)

2.      Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Defendant Judicial Watch, Inc. breached the Confidential Severance Agreement by failing to pay

health insurance for his children? (See Claim No. 2 on page 27.)

                   \_\_\_\_\_ YES           **X**  NO

a.      If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

Answer: _____

3.      Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Judicial Watch, Inc. breached the Confidential Severance Agreement by filing a motion to strike

Plaintiff's appearance in a Florida litigation involving Sandra Cobas after Plaintiff left Judicial

Watch, Inc.?(See Claim No. 3 on page 27.)

                   \_\_\_\_\_ YES           **X**  NO

a.      If yes, designate the type of breach:

                   \_\_\_\_\_ Material     \_\_\_\_\_ Simple

b.      If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

Answer: _____

4.      Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Judicial Watch, Inc. breached the Confidential Severance Agreement by failing to provide

Plaintiff with access to documents regarding a client Peter Paul? (See Claim No. 4 on page 27.)

_____ YES                    __✗__ NO

a.      If yes, designate the type of breach:

_____ Material          _____ Simple

b.      If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

Answer: _____


5.      Has Plaintiff Larry Klayman proved by a preponderance of the evidence his claim that

Judicial Watch breached the Confidential Severance Agreement by disparaging him and

misrepresenting the reasons for his departure from Judicial Watch, Inc.? (See Claim No. 5 on

page 27.)

_____ YES          ✗ NO

a.      If yes, designate the type of breach:

_____ Material          _____ Simple

b.      If yes, what, if any, nominal damages do you award to Plaintiff Larry Klayman?

Answer: _____

3

Judicial Watch and Thomas Fitton v. Larry Klayman

Counterplaintiff Judicial Watch, Inc.:

1.      Has Counterplaintiff Judicial Watch proved by a preponderance of the evidence its claim

that Counterdefendant Larry Klayman breached the Confidential Severance Agreement by

failing to repay a debt owed by Klayman & Associates? (See Counterclaim No. 1 on page 28.)

          X  YES          _____ NO

a.      If yes, designate the type of breach:

          _____ Material      X  Simple

b.      If yes, what, if any, damages do you award to Counterplaintiff Judicial Watch, Inc.?

Answer: _$ 200,000. —_

2.      Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its

claim that Counterdefendant Larry Klayman breached his obligation in the Confidential

Severance Agreement to pay costs and expense arising from his failure to make prompt payment

to Judicial Watch in accordance with paragraphs 10 and 11 of the Confidential Severance

Agreement? (See Counterclaim No. 2 on page 28.)

          X  YES          _____ NO

a.      If yes, designate the type of breach:

          _____ Material      X  Simple

b.      If yes, what, if any, damages do you award to Counterplaintiff Judicial Watch, Inc.?

Answer: _$ 25,000. —_

c.      If you awarded damages, do you find that Counterplaintiff Judicial Watch, Inc. is entitled to prejudgment interest of 6%?

           _____ YES           _X_ NO

3.      Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its claim that Counterdefendant Larry Klayman infringed Judicial Watch, Inc.'s registered trademarks: (1) JUDICIAL WATCH and/or (2)"BECAUSE NO ONE IS ABOVE THE LAW" in violation of the Lanham Act? (See Counterclaim No. 3 on page 28.)

           _X_ YES         _____ NO

a.      If yes, please designate which trademarks (one or both) were infringed.

          _Both_

b.      What, if any, compensatory damages do you award to Counterplaintiff Judicial Watch, Inc.?

        Answer: _$ 750,000.—_

4.      Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its claim that Counterdefendant Larry Klayman engaged in unfair competition by direct mail, email and advertisements including the website supporting the Saving Judicial Watch effort in violation of the Lanham Act by a false and/or misleading affiliation, connection or association between Saving Judicial Watch and Judicial Watch? (See Counterclaim No. 4 on page 29.)

           _X_ YES         _____ NO

5.    Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its

claim that Counterdefendant Larry Klayman engaged in unfair competition by direct mail, email

and advertisements including the website supporting the Saving Judicial Watch effort in

violation of the Lanham Act by using false and/or misleading statements?  (See Counterclaim

No. 5 on page 29.)

$\times$___ YES          ___ NO

a.    If yes to either or both of questions no. 4 and 5, what, if any, compensatory damages do

you award to Counterplaintiff Judicial Watch, Inc.?

Answer: _$1, 000, 000.___

6.    Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its

claim that Counterdefendant Larry Klayman breached the Confidential Severance Agreement by

publishing statements that were disparaging to Judicial Watch, Inc.? (See Counterclaim No. 6 on

page 29.)

$\times$___ YES          ___ NO

a.    If yes, designate the type of breach:

___ Material      $\times$ Simple

b.    If yes, what, if any, compensatory damages do you award to Counterplaintiff Judicial

Watch, Inc.?

Answer: _$ 250, 000.___

6

7.      Has Counterplaintiff Judicial Watch, Inc. proved by a preponderance of the evidence its

claim that Counterdefendant Larry Klayman breached the Confidential Severance Agreement by

using information regarding Judicial Watch, Inc.'s donor or client lists or donor or client data?

(See Counterclaim No. 8 on page 29.)

$\qquad$ X $\qquad$ YES        $\qquad$ NO

a.      If yes, designate the type of breach:

$\qquad$ Material        $\qquad$ X Simple

b.      If yes, what, if any, compensatory damages do you award to Counterplaintiff Judicial

Watch, Inc.?

Answer:  $75,000. —

Counterplaintiff Thomas Fitton:

8.      Has Counterplaintiff Thomas Fitton proved by a preponderance of the evidence his claim

that Counterplaintiff Larry Klayman breached the Confidential Severance Agreement by

publishing statements that were disparaging to Mr. Fitton?  (See Counterclaim No. 7 on page

29.)

                    _X_ YES           _____ NO

a.      If yes, designate the type of breach:

                    _____ Material      _X_ Simple


b.      If yes, what, if any, compensatory damages do you award to Counterplaintiff Thomas

Fitton?

        Answer: _$ 500, 000 -_


        _3/14/18_                           _____
        **DATE**                                **JUROR FOREPERSON**


8